IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PATRICIA LYNN SMITH,

        Plaintiff,

        v.                               Civil Action No. 2:05-CV-35

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.


<u>**REPORT AND RECOMMENDATION**</u>
<u>**SOCIAL SECURITY**</u>


**I. Introduction**

A.    <u>Background</u>

        Plaintiff, Patricia Lynn Smith, (Claimant), filed her Complaint on May 3, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1] Commissioner filed her Answer on July 13, 2005.[2] Claimant

filed her Motion for Summary Judgment on August 12, 2005.[3] Commissioner filed her Motion for

Summary Judgment and Brief in Support on September 12, 2005.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

        2.    <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 8.

[4] Docket No. 9.

C.     Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be DENIED, and this matter be REMANDED to the Commissioner of Social Security and that the ALJ be instructed, on remand, for the sole purpose of considering Mr. Morello's assessment in light of all evidence before him and explain the weight he gave to Mr. Morello' s opinion.

2.     Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.     Procedural History

On December 30, 2002, Claimant  filed for Supplemental Security Income (SSI) payments. The application was denied initially and on reconsideration.  A hearing was held on February 11, 2004 before an ALJ.  The ALJ's decision, dated March 30, 2004, denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on March 16, 2005.  This action was filed and proceeded as set forth above.

B.     Personal History

Claimant was 45 years old on the date of the February 11, 2004 hearing before the ALJ. Claimant has a high school education.  She has no past work experience.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: December 24, 2000–March 30, 2004.

**A. Husari, M.D., F.C.C.P., 11/5/2001, Tr. 113**
Impression:     The patient was diagnosed with upper airway resistance syndrome/primary
                snoring.

**A. Husari, M.D., F.C.C.P., 10/25/2001, Tr. 114**
The patient is a case of mild obstructive sleep apnea.

**A. Husari, M.D., F.C.C.P., 10/25/2001, Tr. 121**
IMPRESSION:       The history and physical examination of the patient suggests  excessive
                  daytime somnolence/sleepiness which can be secondary to obstructive
sleep                       apnea.

**Yancy S. Short, M.D., FACS, 8/6/2002, Tr. 122**
[Claimant's] upper endoscopy showed some irritation and an ulcer.  H. pylori was positive.

**Summersville Memorial Hospital, 6/26/2002, Tr. 125-126**
Assessment:   The patient is a white female with epigastric and lower abdominal symptoms and
              heme positive stool.

**Summersville Memorial Hospital, 6/26/2002, Tr. 127**
Preoperative diagnosis:       Epigastric and lower abdominal pain
                              Heme positive stool.

**Charleston Area Medical Center, 6/26/2002, Tr. 129**
Diagnosis:
1.      Antrum, biopsy:
        Moderate chronic active gastritis; organisms morphologically resembling H. pylori are
        identified (modified giemsa strain).
2.      Biopsy of polyp at 75 cm:
        Hyperplastic polyp.

**Yancy S. Short, M.D., FACS, 7/2/2002, Tr. 133**
[Claimant's] upper scope showed gastric irritation and an ulcer.  Her H. pylori was positive.

**Yancy S. Short, M.D., FACS, 6/13/2002, Tr. 134**
I feel that the blood in her stool could even be coming from her stomach.

**Yancy S. Short, M.D., FACS, 7/25/2002, Tr. 135**
Assessment:   The patient is a white female with fibrocystic breast disease and excessive vaginal
              bleeding.

**West Virginia Disability Determination Service, 3/2/2003, Tr. 138-141**
Diagnostic Impression:        Allergic rhinitis, degenerative disc disease and gastroesophageal
                              reflux disease.

**Mahoning Valley Imaging, 2/2/72003, Tr. 143**
Impression:     No Acute cardiopulmonary process.

**Physical Residual Functional Capacity Assessment, 3/24/2003, Tr. 145-153**
EXERTIONAL LIMITATIONS:
     Occasionally lift and/or carry, 50 pounds;
     Frequently lift and/or carry, 25 pounds;
     Stand and/or walk for a total of, at least 6 hours in an 8-hour workday;
     Sit for a total of, about 6 hours in an 8-hour workday;
     Push and/or pull, unlimited.

POSTURAL LIMITATIONS:
     Climbing: occasionally.
     Balancing, Stooping, Kneeling, Crouching, Crawling: frequently.

MANIPULATIVE LIMITATIONS:
     "None established" in all categories.

VISUAL LIMITATIONS:
     "None established" in all categories.

COMMUNICATIVE LIMITATIONS:
     "None established" in all categories.

ENVIRONMENTAL LIMITATIONS:
     Extreme cold: avoid concentrated exposure.
     Extreme heat, Wetness, Humidity, Noise, Vibration, Fumes, odors, dusts, gases, poor
     ventilation, Hazards: unlimited.
     Hazards (heights):  avoid concentrated exposure.

**Summertsville Memorial Hospital, 10/16/2002, Tr. 156**
Impression:     Presence of a small disc, midline toward the left at C-5/C-6, otherwise
               unremarkable.

**Summertsville Memorial Hospital, 10/16/2002, Tr. 157**
Impression:     Presence of a medium-sized disc herniation central toward the right at L-4/L-5,
               otherwise unremarkable.

**Jefferson Cardiovascular Associates, 1/4/2002,  Tr. 158**
Conclusion:     Normal SPECT Sestamibi scan with normal LV systolic function.

**Summersville Memorial Hospital, Stress EKG, 1/5/2002, Tr. 159**

Impression:     Negative GKT at low workload.

**Jefferson Cardiovascular Associates, 10/11/2001, Tr. 164**
Conclusion:     Normal cardiac chambers with preserved RV and LV systolic function.  There is
                no valvular abnormality.  There is no finding to indicate a cardiac cause of her
                dyspnea.  There is no regurgitation or stenosis to account for the murmur on exam.
                The patient may have a flow murmur.

**Webster County Memorial Hospital, 5/12/2003, Tr. 167**
Diagnosis:      Asthma, GERD, back pain with radiculopathy

**Webster County Memorial Hospital, 4/30/2003, Tr. 168**
Impression:     1.      Sliding hiatal hernia.
                2.      Gastroesophageal reflux disease.

**Webster County Memorial Hospital, 4/28/2003, Tr. 169**
Diagnosis:      Sinusitis, Gastritis, Asthma, neck pain, sleep apnea.

**Webster County Memorial Hospital, 3/19/2003, Tr. 174**
Diagnosis:      Herniated Discs and radiculopathy; history of lupus.

**Webster County Memorial Hospital, 3/3/2003, Tr. 175**
Impression:     No acute disease.

**Webster County Memorial Hospital, 3/3/2003, Tr. 177**
Diagnosis:      [Illegible] back and neck pain; bulging discs and radiculopathy; asthma; sleep
                apnea; anxiety.

**Webster County Memorial Hospital, 1/13/2003, Tr. 182**
Diagnosis:      Cervical and back pain; asthma.

**Webster County Memorial Hospital, 12/16/2002, Tr. 187**
Diagnosis:      Back and neck pain; disc herniation.

**Webster County Memorial Hospital, 11/4/2002, Tr. 191**
Diagnosis:      Back pain; neck pain.

**Webster County Memorial Hospital, 10/1/2002, Tr. 192**
Diagnosis:      Resistant low back pain; radiculopathy; cervical pain.

**Webster County Memorial Hospital, 9/13/2002, Tr. 193**
Impression:     There are minimal degenerative changes in the lower cervical spine.

**Webster County Memorial Hospital, 9/13/2002, Tr. 194**
Diagnosis:    Back and neck pain; arthritis; GERD, duodenitis.

**Webster County Memorial Hospital, 3/14/2002, Tr. 195**
Diagnosis:    Sleep apnea.

**Webster County Memorial Hospital, 12/14/2001, Tr. 196**
Diagnosis:    Sleep apnea.

**Webster County Memorial Hospital, 11/16/2001, Tr. 202**
Diagnosis:    Sleep apnea.

**Webster County Memorial Hospital, 10/31/2001, Tr. 206**
Diagnosis:    Sleep apnea.

**Webster County Memorial Hospital, 10/05/2001, Tr. 209**
Diagnosis:    Sleep apnea.

**Webster County Memorial Hospital, 9/20/2001, Tr. 210**
Impression:   No acute pulmonary or pleural pathology.

**Webster County Memorial Hospital, 9/20/2001, Tr. 211**
Diagnosis:    Sleep apnea.

**Webster County Memorial Hospital, 6/26/2001, Tr. 213**
Impression:   Very tiny cyst in the left breast, otherwise negative exam.

**Physical Residual Functional Capacity Assessment, 6/26/2003, Tr. 239-246**
EXERTIONAL LIMITATIONS:
      Occasionally lift and/or carry, 50 pounds;
      Frequently lift and/or carry, 25 pounds;
      Stand and/or walk for a total of, at least 6 hours in an 8-hour workday;
      Sit for a total of, about 6 hours in an 8-hour workday;
      Push and/or pull, unlimited.

POSTURAL LIMITATIONS:
      "None established" in all categories.

MANIPULATIVE LIMITATIONS:
      "None established" in all categories.

VISUAL LIMITATIONS:
      "None established" in all categories.

COMMUNICATIVE LIMITATIONS:
    "None established" in all categories.

ENVIRONMENTAL LIMITATIONS:
    "None established" in all categories.

**Summersville Memorial Hospital, 7/08/03, Tr. 248**
Impression:    Benign appearing bilateral mammography.

**Raleigh General Hospital, 7/20/2003, Tr. 249**
Final Diagnosis:    Negative for intraepithelial lesion or malignancy.

**Summersville Memorial Hospital, 6/28/03, Tr. 253**
Impression:    No evidence of malignancy.  Breast category I.

**Summersville Memorial Hospital, 12/12/01, Tr. 259**
Impression:    Three distinct nodular masses in the uterus most likely due to uterine fibroids.
               When compared to the previous examination of 8/21/01, little if any change has
               occurred discounting difference in technique.

**Summersville Memorial Hospital, 10/15/01, Tr. 261**
Impression:    Mildly enlarged bulky uterus with inhomogeneous echogenic density in body of
               uterus.  May represent small leiomyoma.  Just one leiomyoma measures 2.5 X 2.4
               X 2.2 cm in size over fundus of uterus.

**Webster County Memorial Hospital, 6/27/2001, Tr. 266**
Diagnosis:    Tachycardia; persistent back and neck pain; asthma.

**Clarksburg Cardiology Consultants, Echocardiogram Report, 8/6/2002, Tr. 268-269**
Impression:    Poor functional capacity.  CP and SCA negative.

**Clarksburg Cardiology Consultants, 7/9/2003, Tr. 270-271**
Impression:    1.    Tachycardia.  EKG showed sinus tachycardia.  This is most likely to
                     COPD.
               2.    Chest pain, sounds very atypical.  She has MP scan in January of 2002
                     which was negative.
               3.    History of acid reflux disease.
               4.    History of hiatal hernia.
               5.    History of peptic ulcer disease.
               6.    Chronic smoking.
               7.    Poor functional capacity.
               8.    History of chronic back problem.  She has heniated disc.

**Webster County Memorial Hospital, 11/21/2003, Tr. 277**

Diagnosis:       Left knee pain; asthma.

**Webster County Memorial Hospital, 10/30/2003, Tr. 278**
Diagnosis:       Left knee pain; asthma; tachycardia.

**Webster County Memorial Hospital, 10/31/2003, Tr. 282**
Impression:     Mild to moderate osteoarthritis of th left knee.

**Lucas J. Pavlovich, M.D., 11/12/2003, Tr. 286**
Assessment:   Patellofemoral arthritis.

**Cardinal Psychological Services, LLC, 12/9/2003, Tr. 287-292**
Diagnostic Impression:
Axis I:                         Major depressive disorder, recurrent, severe;
                                Anxiety disorder, NOS.
Axis II:           None.
Axis II:           Disc problem, acid reflux disorder, ulcers and heart disorder.
Axis IV:         Economic problem–low income;
                                Vocational problem–unemployed.
Axis V.          55.

**Psychiatric Review Technique, 12/31/2003, Tr. 293-306**
Affective disorders:
Anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; feeling of guilt or worthlessness.

Anxiety-related disorders:
Generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectations, vigilance and scanning.

Functional limitations:
Restriction of activities of daily living; difficulties in maintaining concentration, persistence or pace: moderate.
Difficulties in maintaining social functioning: marked.
Repeated episodes of decompression: one or two.

"C" criteria of the listings:
repeated episodes of decompression; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

**Mental Residual Functional Capacity Assessment, 12/31/2003, Tr. 307-311**
Understand and remember short, simple instructions, mild.
Carry out short, simple instructions, mild.

Understand and remember detailed instructions, moderate.
Carry out detailed instructions, moderate.
Exercise judgment or make simple work-related decisions, moderate.
Sustaining attention and concentration for extended periods, mild.
Maintaining regular attendance and punctuality, mild.
Completing a normal workday/workweek, moderate.
Interacting appropriately with the public, mild.
Responding appropriately to direction and criticism, mild.
Working in co-ordination with others, moderate.
Maintaining acceptable standards of grooming and hygiene, moderate.
Maintaining acceptable standards of courtesy and behavior, mild.
Relating predictability in social situations, mild.
Demonstrating reliability, moderate.
Ability to ask simple questions or request assistance, moderate.
Ability to respond to changes in the work setting, moderate.
Ability to be aware of normal hazards and take appropriate precautions, mild.
Carrying out an ordinary work routine, mild.
Setting realistic goal and making plans independently of others, moderate.
Traveling independently in unfamiliar places, mild.
Ability to tolerate ordinary work stress, moderate.

**Residual Functional Capacity Assessment, 1/12/2004, Tr. 312-319**
Impairments: fibrocystic breast disease; tachycardia, secondary to COPD and meds taken for same; acid reflux disease; hiatal hernia; PUD; chronic smoking; poor functional capacity; COPD-asthma; mild sleep apnea; enlarged tongue; allergic rhinitis; C6-C7 minimal disc hernation with no impingement on the cord; L4-L5 central herniation putting pressure on thecal sac, mostly right side; chronic neck pain with radiation to shoulders; chronic low back pain with radiation into both legs.

**Summersville Memorial Hospital, 11/7/2003, Tr. 325**
Impression:    Tear posterior horn of the medial meniscus.
             Meniscoid degeneration with abnormal morphology of all enisci visualized.
             Large joint effusion.
             Findings consistent with chondromalacia patella.
             Arthritic joint changes.

**Lucas J. Pavlovich, M.D., 2/10/2004, Tr. 327**
Assessment: rheumatoid arthritis involving both knees, ankles and hips.


D.    Testimonial Evidence
1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 328-358):

Q      All right.  You heard me tell the Judge right before we began that Dr. Pavolovich apparently has told you that you have rheumatoid arthritis?

A      Yes.

Q      Had you seen him before?

A      I seen him in November.

Q      And the reason you saw him in November was?

A      My left leg, this side of it was burning real bad, and it was hot to the touch.  And they had run all the tests for arthritis and said I had arthritis, so they sent me down for an MRI on my leg.  And then they sent - - I had to take it and go to Elkins, and when he looked at, he said that the thing in your knee - - joint - -

ALJ    Meniscus.

BY ATTORNEY:

Q      The patella is your kneecap.

A      Cartilage.

Q      Okay.

A      The cartilage in my knee was damaged.   He said that it was starting to deteriorate and he said that I had torn the ligaments in the sides of my leg.  And he asked me how I done it, I told him I had gotten out of bed and a sharp pain hit my knee and I fell back onto the bed. And he said, well, that's what done it, and he said that it wouldn't get no better, but the shot would help improve the torn ligaments in my knee.  So he gave me the shot, and said he was going to send off for the records where they had sent all the arthritis.  And when I went yesterday, he told me that from what he had gotten that I had rheumatoid arthritis and neuropathy and that he couldn't give

me the cortisone shots because cortisone damages the nerves; it deadens them.  And he said that the neuropathy would end up deadening the nerves eventually any way.  And he didn't want to speed it up unless it was absolutely necessary.

*          *          *

Q And is it your understanding that you have a herniated disc in both your neck and in your low back?

A Yeah, I have two in my neck area and two in my lower back.

*          *          *

A Well, they had - - I had kept telling them about my arms going numb and sharp pains in my upper back and lower back, that I was having trouble getting out of bed every morning.  And when I stooped over or bent over, I'd take sharp pains and almost fall.  Well, when the doctor did  the fluoroscoping for my stomach, when I went back to him, he told me that the muscles from my back was causing problems with my stomach.  And I thought he was nuts, because I didn't know your muscles run from your back to your stomach.

Q Now, are you talking about muscle spasms?

A Yeah, I would have muscle spasms around through here.

Q Okay.

A And I didn't know that the muscles run that way.

*          *          *

A Well, when Dr. Rainey [phonetic] done my yearly exam, he found that I was bleeding through my rectum.  And he thought that it could be, you know, serious.  And he recommended that I go see Dr. Short.  And so, Webster set it up for me to go see Dr. Short and he

said, yes, I needed to be fluoroscoped and have the colonoscopy to make sure that everything was okay.  Well, I went through it, you know, got that all done in June.  And when I went back to him in July, he told me that my stomach problems was severe.  That Webster needed to do some kind of - - that x-ray thing where you drink stuff.

                    *                    *                    *

Q       Okay.  Now, do I understand, do you have a hiatal hernia?

A       Yeah.

Q       And do you have gastric reflux?

A       Yeah.

                    *                    *                    *

Q       Okay.  All right.  Did you also have some bowel problems?

A       Yeah, I had trouble with my bowels, and at times I had pooping.

Q       You were constipated?

A       Yeah.

Q       Okay.  Did you have diarrhea at times?

A       Yeah at times, I'd have diarrhea; other times I'd have trouble going.

Q       Okay.  Did he tell you you had an irritable bowel syndrome?

A       Yeah, he told me that that's what was causing it.

                    *                    *                    *

Q       Okay.  All right.  Then getting back to what we were asking you then about the herniated disc in your neck and low back.  First of all, could you tell me what difficulty does the neck or do the discs in your neck give you?  What problems do you have?

A       Well, across my shoulder blades will start burning, it's like a fire.  And it shoots down around my neck, across my shoulders and down around.  And then I'll start burning here.

Q       Now, you're pointing to the front of your chest, just around where your collarbones are?

A       Yeah.  It'll start burning here.  And then I'll take real sharp pains that run up into the lower part of my head here.  And then my back of my head will go completely numb.  My arms will go numb and I can still use my fingers, but I can't feel, you know, like if I'm breaking an egg, I don't know how hard I'm gripping it.  So, I'll tend to crush it in my fingers at times.  So, I have to, you know, watch how I do stuff when my hands are numb, because I can't feel what I'm doing.

Q       Does that have any impact on how well you do it or how long it takes you to do it?

A       Yeah, it does. I mean sometimes it takes a long time for me to complete stuff that only took a few minutes, but I still try.

Q       Okay.  Now, you're talking about preparing meals?

A       Yeah.

Q       Or doing something in the kitchen.

A       Well, I used to make everything homemade, you know, everything.  And now, I've got to, you know, take stuff out of cans, pop out biscuits, you know, stuff I never would have dreamed fixing, because I always made my corn bread in iron skillets.

Q       Um-hum.

A       You know, the old fashioned way.  And now I can't lift the iron skillet to make it. If I make it in an iron skillet, I have to have someone lift the skillet to put it in the oven for me

and take it out of the oven for me. I can't do it on my own.

Q     Okay. Now, you indicated that you have numbness in your arms. Now, it seems like you've had some difficulty with your hands being unsteady?

A     Yeah, they shake from time to time to where I can't control them.

Q     Is that something that changes? Like does it come and go?

A     Well, see how cold they are?

Q     Yeah, Judge, she does, she has - -

A     My hand is numb and it will shake.

*          *          *

Q     All right. What I'm asking you about your hand is - - does that come and go?

A     Yeah, it'll come and go, but when I go to do tedious things like put on make-up, put jewelry, it'll start shaking until I can't do it. And I'm afraid of poking myself in the eye because I'm right-handed and I have to use my right hand. So I can't, you know, fix my hair, I can't get the knots out of my long hair, I can't put make-up on, I can't put my jewelry on.

*          *          *

A     Well, at times my legs will start shaking just like my hand and like when I go upstairs every morning to wake up my son. He has to have four crackers with peanut butter and a glass of milk, you know, that's what he's always had since he was little. And I have to set the stuff on the side of the stairs and crawl up the stairs and move the stuff on the side of the stairs and crawl up the stairs and move the stuff up a stair at a time until I get to the top landing to where I can set it up on it and pull myself up. And then I'll get on the landing, pick the stuff up and sometimes I'll slop it. And I'll go in, and I wake up Chris.

\*　　　　\*　　　　\*

Q        All right.  Okay.  Now, so you've told us that your legs tremble at times climbing stairs?

A        Yeah.  They go numb.

\*　　　　\*　　　　\*

A        Sometimes I do, I can't get to sleep, I'm up most of the night.

Q        Why is it that you can't get to sleep?

A        Well, because my legs - - I'm having spasms in my legs and in my back, pain shoots up the back of my neck, causes me to have real bad headaches until I can't sleep.

Q        Okay.  So you have the headaches at night?

A        Yeah.

Q        Do you have any headaches in the daytime?

A        Not if I don't watch TV.

Q        What has to do with the TV?

A        Well, if I watch too much TV, like if I - - I catch the weather, and I catch, you know, bits and pieces of it.  But if I watch too much TV at one time, it's like my eyes will start burning and the back of my neck will start burning.  And then I'll get a real bad headache, and I can't think; I can't concentrate.

\*　　　　\*　　　　\*

Q        Is it difficult for you to get out and about?

A        Yeah, I have trouble - - well this kind of weather, I have trouble walking on the snow and the ice; my feet tend to slip easy.  So, I have to hold onto somebody when I'm walking.

Q       Okay.  Let me ask you about just ordinary things like getting dressed in what I call street clothes or just regular wear, do you get dressed every day?

A       Yeah, I have trouble getting dressed, but I dress myself every day.

### 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 358-364):

Q       Please assume that this is a younger individual with a high school education; precluded from performing all but sedentary work, with a sit/stand option; only occasional postural; no hazards, no temperature extremes, clean air, no climbing, unskilled/low-stress, defined as one- and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry-level.  And finally Ms. Blake and Dr. Mace mentioned in Exhibit 17F an issue regarding the claimant's hands, and in this hypothetical, no prolonged use of the hands - - I'm going to put work entailing simple grasping as opposed to fine manipulating.  The hypothetical will be sedentary sit/stand; only occasional posturals; no hazards, no temperature extremes; clean air; no climbing; low stress; and only simple grasping as opposed to repetitive fine manipulation.  With those limitations, can you describe any work this hypothetical individual can do?

A       Yes, Your Honor, at the sedentary level, security surveillance, sedentary around 7,000 nationally, 1,100 regionally, the DOT number is 378.367-010.  Or machine tender, sedentary, 141,000 nationally, 1,400 regionally.  An example of that would be 739.685.054.

Q       The second hypothetical, an additional question, I mentioned 17F, which is an RFC of Ms. White, CA, EAC, I guess - - what's the capitol C stand for?  Her name says Debbie

White -          ATTY          Certified.

ATTY          Judge and Dr. Mace's signature is on that.

ALJ          Okay, and it's signed by both Ms. White and Dr. Mace, family physician.

BY ADMINISTRATIVE LAW JUDGE:

Q          They state that the claimant would need her significant - - to lie down during the day with her feet up.  If that even occurred - - I think Ms. - -

[Tape 2, Side 1.]

ALJ          Okay.  We're on the second tape of Ms. Smith's case.

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q          I was asking Mr. Bell if I added the limitation of sitting - - I'm sorry, frequent rest periods with the claimant's feet up, if that happened an hour-and-a-half of the day of the day - - of the workday, are those jobs precluded?

A          Yes, Your Honor.

Q          Next question is 15 and 16 of Exhibit 17, page 4.  Okay.  The doctor and the Physician's Assistant mentioned the claimant's chronic pain is moderate to severe.  If that is so severe that she cannot stay on task, 1/3 to 2/3 of the workday, and I'm also eluding to the RFC of the psychologist in Exhibit 16F, are those jobs precluded?

A          Yes, Your Honor.

Q          The psychologist's mental assessment is in Exhibit 16F, and the most - - except for moderate limitations, and we talked about stress and I alluded to that in the last hypothetical affecting her concentration.  What about attendance, would the jobs you named, employers in the

17

jobs you named in hypothetical 1, allow her absenteeism of even two days consistently per month?

A    If you're going to miss one to two days per month, I don't believe that would be allowed, no.

ALJ    Okay.  Ms. VanNostrand.

ATTY    Well, if I phrase that last question just a little differently.  Let me see if I can find it here.  Focusing on the work then, you talked about in terms of attention and concentration.  And I'm just going to say that up to ½ of the time or up to ½ of the workday, she's going to need more breaks than normally is provided.  Is that inconsistent with the performance of these jobs that you identified to?

VE    Well, if you say up to, I mean if it's zero.

ATTY    One-third to a half. One-third to a half.

VE    That would not be allowed.

ATTY    Okay.  If you just - - instead of the one-third to two-thirds, maybe I asked you this, and if I did, please pardon me.  But looking at being off task as a result of attention and concentration or stress reactions, if that is one-third to half, would there be any difference in your testimony?

VE    No.

ATTY    Actually, I [INAUDIBLE], sorry.  Okay.  Judge, I don't have more questions, because I think you covered the assessments of the physician and the psychologist basically.

ALJ    Okay.  And one other thing I wanted to add is Ms. Blake and I think, let me

see if I [INAUDIBLE] those two - - I stand corrected, but I think Exhibit 20F you gave me today, Ms. Blake, only states the claimant has a five-pound limitation, and I think I've seen it earlier in the out-patient notes of the Webster County Clinic.

ATTY    Yes. Right.

ALJ    If that is true, Mr. Bell, is the monitor job, for example, entail lifting over five pounds?

VE    No, Your Honor, it wouldn't.

ALJ    What does it tend to entail?

VE    Just some papers?

ALJ    Less than a pound?

VE    One to two pounds.

ATTY    If - - I did think of two more, Judge, if I could throw them - -

ALJ    Sure, go ahead.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q    Sir, if you assume that this person has a problem with watching television, and we don't know whether it has to do with maybe tension in her neck muscles, or whatever, we're not sure. But she has difficulty with prolonged television in that it tends to trigger a headache. And so, while she could watch probably several hours of television during the day, she couldn't prolonged watch a television screen or even a monitor screen, would that have any impact on either of the jobs you've identified?

A    It would affect the security surveillance.

Q    Are you saying it would rule it out?

A     Yes.

Q     And going back to the hands, I'm just going to be a little more specific about the limitations that what we have is a right dominant hand that has off and on during the workday periods of trembling and therefore, she would have a difficult time doing things like writing. And she tends to lose the feeling in her hands. And therefore, she's going to be limited in her ability to feel, even though she might be able to grip or grasp, she couldn't feel what she was grasping, and therefore her pace is going to be considerable slowed. She also has to avoid any kind of repetitive or prolonged reaching and moving the right arm out in front or in any direction simply because of the elbow. And I'm wondering if that would have any impact on those jobs that you've identified.

A     It would impact the job tender job negatively.

Q     In other words, that would rule it out?

A     Yes.

*          *          *

E.     Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•     Obesity (230 pounds). (Tr. 138-141, 333).

•     Smokes 3 to 4 cigarettes a day (Tr. 333).

•     Can stand, 10-15 minutes (Tr. 344).

•     Can sit, 20 minutes (Tr. 344)

- Naps at 11 a.m. and 1 p.m. (30-45 minutes.  (Tr. 347).

- Can walk/stand during the day, 1 hour (Tr. 348).

- Watches television (349).

- Reads the newspaper (Tr. 349).

- Can sit with pillows (3 hours) (Tr. 350).

- Sweeps and vacuums. (Tr. 3350).

- Can dress herself.  (Tr. 352).


### III.  The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in failing to include all of Claimant's severe impairments, specifically her obesity, and in failing to consider Claimant's combined impairments; (2) in failing to evaluate Claimant's obesity in accordance with SSR 02-01p; (3) in failing to afford appropriate weight and deference to the RFC assessment of Dr. Mace and Debby Blake; (4) in failing to include all of Claimant's mental impairments; and (5) in posing an incomplete and inaccurate hypothetical question to the Vocational Expert.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly considered all of Claimant's alleged impairments; properly analyzed whether Claimant met or equaled any of the listed impairments; properly analyzed and weighed the medical evidence; included all of Claimant's alleged mental impairments; and posed a proper hypothetical question to the Vocational Expert.

B.     The Standards.

1.     <u>Summary Judgment</u>.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her

insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once

claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

1. THE ALJ FAILED TO LIST CLAIMANT'S OBESITY AS A SEVERE IMPAIRMENT, and
2. FAILED TO EVALUATE HOW CLAIMANT'S OBESITY MIGHT COMBINE WITH OTHER IMPAIRMENTS.

Claimant contends that the ALJ failed to properly consider her obesity. The Commissioner asserts that the ALJ correctly consider Claimant's obesity.

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). See also Byrd v. Apfel, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[5] Social Security Ruling 85-28. "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted). "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize them." Id. "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id.

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>.

In this case, Claimant alleged that she was disabled as a result of back problems, breathing problems, a hernia, stomach problems and pain in the arms, legs and hips. (Tr. 17, 58-60, 71-73). Claimant never alleged that her weight caused her either physical or mental functional limitations. Claimant also never alleged that her weight contributed to her alleged inability to work. Claimant did not raise obesity as an impairment or limitation until this appeal.

Claimant cites Social Security Ruling ("SSR") 02-1(p) for the proposition that, because the ALJ failed to consider Claimant's obesity as a severe impairment and failed to evaluate how Claimant's obesity might combine with other impairments to meet or equal a listed impairment, the ALJ's decision should be reversed and this case should be remanded. Pl.'s Br. at 12-13. Claimant's argument is misplaced. Obesity is not in and of itself a disability. <u>See</u> Social Security Ruling 02-1p: "Titles II and XVI: Evaluation of Obesity," 2000 WL 628049 (S.S.A); 20 C.F.R. Pt. 404, Subpt. P, Part A 1.00 B(2)(d). An ALJ should consider whether obesity, in combination with other impairments, prevents Claimant from working. <u>Id</u>. The Court in <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552-53 (3rd Cir. 2005), held that failure to explicitly address a claimant's obesity did not warrant remand. Additionally, the Court in <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 504 (7th Cir. 2004), stated that, when an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the claimant, his obesity is

25

understood to have been factored into their decision.

In the instant case, the ALJ stated that he reviewed all evidence and relied on this evidence to determined that Claimant was capable of sedentary work. (Tr. 16, 24). The ALJ correctly cited standards for determining medical severity of Claimant's alleged impairment. He acknowledged that the regulations require that, if a severe impairment exists, it must be considered in the remaining steps of the five-step analysis. (Tr. 17). As the ALJ repeatedly stated that he considered the entire medical record carefully (Tr. 16, 24), he was clearly aware of Claimant's obesity. Claimant also neglected to mention during the hearing how her obesity affected her ability to work

In reviewing the decision of the ALJ, the Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456. In the instant case, the ALJ's decision considered all alleged impairments. Therefore, Claimant failed to establish grounds for remand.

### 3. THE ALJ FAILED TO AFFORD APPROPRIATE WEIGHT AND DEFERENCE TO THE RFC ASSESSMENT OF DR. MACE AND DEBBY BLAKE.

Claimant asserts that the ALJ improperly evaluated the opinions of Dr. Mace and Debby Blake. Commissioner counters that the ALJ gave proper weight to Claimant's treating and examining physicians.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also, Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461

(1983); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990). In determining the weight to be given to a medical opinion, the ALJ considers, <u>inter alia</u>, the examining relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, and specialization. <u>See</u> 20 C.F.R. § 416. 927(d)(1)-(6). An ALJ is not bound to accept the opinion of a treating physician which is speculative and inconclusive. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

At the outset, it is noted that Ms. Blake is a physician's assistant and, therefore, is not an acceptable medical source. <u>See</u> 20 C.F.R. § 416. 913.[6] However, in <u>Gomez v. Chater</u>, 74 F.3d 967, 972 (9th Cir. 1996), the Court held that the opinion of a nurse practitioner could be viewed as an acceptable medical source where the record clearly established that "she was acting as an agent" of the doctor. In this case, the record provides no evidence to the contrary. Ms. Blake prepared the RFC assessment, which was countersigned by Dr. Mace. Therefore, it is considered to be an "acceptable medical source." However, the ALJ did not err in his consideration of this medical opinion. In his decision, the ALJ noted that "there is no indication, however, that the physician's assistant's opinions are based on objective medical evidence in the record, other than the exams of the physician's assistant." (Tr. 22). The ALJ further explained that:

The undersigned also gives less weight to the opinions [contained in Ms.

---

[6] The term "acceptable medical sources" is defined to include (1) licensed physicians, (2) licensed osteopaths, (3) licensed or certified psychologists, (4) licensed optometrists, (5) persons authorized to send the Secretary a copy or summary of the medical records of a hospital or other institution, and (6) the "report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source." 20 C.F.R. § 416. 913 (a).

Blake's RFC] inasmuch as they appear to be inconsistent with the weight of other medical evidence, as well as internally inconsistent. For example, the [RFC] indicates that the claimant ca do essentially light exertional work, including walking and standing, lifting 10 pounds frequently, and up to 20 pounds occasionally, or sitting most of the time pushing and pulling. (Exhibit 17F/3). This opinion is later contradicted by indications that the claimant can sit for only one hour, stand for 30 minutes, and walk for 15-30 minutes at one time . (Exhibit 17F/4). Moreover, the objective medical evidence does not support that the claimant's range of motion, while restricted somewhat, would limit her to the extent cited at Exhibit 17 F/4. For all the above reasons, the undersigned gives little weight to the opinions in Exhibit 17F. (Tr. 22).

In fact, in March 2003, Dr. Sabio noted that Claimant's extremities were normal, forward flexion of the lumbar spine was ninety degrees with pain, she had an essentially normal straight leg raising test, her neurological examination was normal, her knees allowed one hundred and thirty degrees of flexion, and there was tenderness all over the spine. (Tr. 140). Although Claimant complained of shortness of breath, her breathing during the exam was effortless. (Tr. 141). Her gait was; she did not required any ambulatory aids; she had no muscle atrophy or weakness; she could squat; she was able to walk on her heels; and she could stand on either leg separately. (Tr. 141). Claimant had a normal pulmonary function score, and her chest x-rays demonstrated no acute cardiopulmonary process. (Tr. 142-43). In October 2003, X-rays of Claimant's left knee demonstrated only mild to moderate osteoarthritis. (Tr. 282). In November 2003, Dr. Pavlovich diagnosed patellofemoral arthritis and a medial meniscus tear and gave Claimant a cortisone injection. (Tr. 286). In December 2004, Dr. Pavlovich diagnosed rheumatoid arthritis involving both knees, ankles and hips and recommended a cortisone injection or a diagnostic arthroscopy. (Tr. 327). There is no indication, however, that Claimant followed up on this treatment.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is

limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. After reviewing the record, the Court finds that the ALJ properly evaluated the medical evidence of record and, therefore, his finding was supported by substantial evidence. Accordingly, the ALJ did not err when he did not give controlling weight to the RFC prepared by Ms. Blake and countersigned Dr. Mace.

### 4. THE ALJ IGNORED THE MENTAL RESIDUAL FUNCTIONAL ASSESSMENT BY MR. MORELLO AND DID NOT INCLUDE THE SPECIFIC LIMITATIONS IN MENTAL WORK FUNCTIONING IN HIS RFC.

Claimant further alleges that the ALJ erred because he ignored Mr. Morello's mental assessment and that the ALJ's determination of her Residual Functional Capacity ("RFC") was error because the ALJ did not perform a function-by-function analysis pursuant to Social Security Ruling ("SSR") 96- 8p. Commissioner counters that the ALJ did not err in his consideration of Mr. Morello's mental assessment and properly determined Claimant's RFC.

SSR 96-8p requires that medical source opinions must always be considered and addressed by the ALJ in the RFC assessment, and if it conflicts with the ALJ's conclusions then the ALJ must explain why it was not adopted. The Court will affirm the ALJ's determination of Claimant's RFC if the ALJ applied the proper legal standard and his decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Preparing a function-by-function analysis for medical conditions or impairments that the ALJ find neither credible nor supported by the record is unnecessary. See SSR 96-8p.

In this case, however, the ALJ failed to explain the weight he gave to Mr. Morello' s opinion. Consequently, the Court is unable to determine whether the ALJ decision is supported

by substantial evidence .  Under these circumstances, remand is appropriate, so that the ALJ may explain his findings.  The Undersigned, therefore, recommends that this matter be REMANDED to the Commissioner and that the ALJ be instructed, on remand, to consider Mr. Morello's assessment in light of all evidence before him and explain the weight he gave to Mr. Morello' s opinion.

With regard to the RFC, the ALJ may have included all of Claimant's impairments, but because the ALJ was unclear in the weight he accorded Mr. Morello's medical opinion, the RFC determination might have been insufficient.  Accordingly, on remand, the ALJ must determine whether his previous RFC determination is sufficient in light of his decision regarding Mr. Morello's assessment.

## 5.  THE ALJ RELIED UPON AN INCOMPLETE AND INACCURATE HYPOTHETICAL QUESTION POSED TO THE VOCATION EXPERT.

Finally, Claimant contends that the ALJ decided the case on the basis of an incomplete and inaccurate hypothetical question to the VE.  The Commissioner counters that the ALJ included all of Claimant's limitations supported by the record.

The question is whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments.  The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record.   Russell v. Barnhart, No. 02-1201, 2003 U.S. App. LEXIS 2178 (4th Cir. Feb. 7, 2003).  The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe.  Id.

In this case, the ALJ did not err by failing to include the functional limitations listed in

Ms. Blake's assessment.  As previously noted, the evidence of record did not support Ms. Blake's assessment.  However, because the ALJ failed to explain the weight he accorded to Mr. Morello's medical opinion, The Undersigned recommends that this matter be REMANDED to the Commissioner and that the ALJ be instructed, on remand, to determine whether his previous hypothetical is sufficient in light of his decision regarding Mr. Morello's opinion.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED, and this matter be REMANDED to the Commissioner of Social Security and that the ALJ be instructed, on remand, for the sole purpose of considering Mr. Morello's assessment in light of all evidence before him and explain the weight he gave to Mr. Morello's opinion.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the

Administrative Procedures for Electronic case Filing in the Unites States District Court for the

Norther District of West Virginia.

DATED: April 25, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE